IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REAL ESTATE RICHES, INC., | : | NO: |
| a Pennsylvania Corporation, | : | |
| | : | Jury Trial Demanded |
| and | : | |
| | : | |
| JEFFREY L. RUBIN, | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| BRIAN FENTIMAN, MARIA | : | |
| SCHLESINGER, RANDY T. WRAY, | : | |
| RAYMOND ABBOUD, | : | |
| ABRAHIM KHAN, DAVID | : | |
| SANDBERG and CHRISTOPHER | : | |
| SANDBERG, | : | |
| | : | |
| Defendants | : | |

**<u>COMPLAINT</u>**

NOW COME Plaintiffs, by and through their undersigned counsel, Cunningham & Chernicoff, P.C. and for their Complaint against Defendants say as follows

1.      Plaintiff, REAL ESTATE RICHES, INC. (hereinafter sometimes referred to as "RER") is a Pennsylvania corporation with its principal place of business at North Huntingdon, Pennsylvania.

2.      RER engages in the business of offering, selling, and conducting a program, (hereinafter sometimes referred to as the "Program" or the "RER Program") of real estate education and mentoring which includes, inter alia, a classroom component designed to educate students in techniques for real estate investing together with a mentoring component that provides RER students with a ninety day period of ongoing access to experienced real estate investors who serve as mentors to the students for the ninety day period following the students' completion of the classroom component of the RER program.  Upon completion of the classroom component and the ninety day period of mentoring, RER students become known as RER "Members".

3.     Plaintiff JEFFREY L. RUBIN (hereinafter "RUBIN") is a resident of the state of Florida, residing in Sarasota County, Florida.

4.     RUBIN is a founder of RER as well as an Officer, Shareholder, and Director of RER. RUBIN is the sole owner of the "Real Estate Riches" trademark filed for registration as a service mark with U.S. Patent and Trademark Office on March 15, 2006 and registered February 27, 2007 and assigned registration number 3212892 by the  United States Patent and Trademark Office. RUBIN is also the sole owner of the corporate stock in Real Estate Riches, Inc., and the related RER corporate entities and the beneficial owner of all their tangible property, intellectual property and other assets, including the copyrighted RER course and marketing materials and all refinements, modifications and improvements thereof. The trademark and other property described in this Paragraph is hereinafter referred to as the "RER Assets"

5.     Defendant BRIAN FENTIMAN (hereinafter sometimes referred to as "FENTIMAN") is a resident of the state of Pennsylvania residing at 5011 Rainbow Court, Allentown, Pennsylvania 18106.

6.     Defendant MARIA SCHLESINGER (hereinafter sometimes referred to as "SCHLESINGER") is a resident of the state of Pennsylvania residing at 5011 Rainbow Court, Allentown, Pennsylvania 18106.

7.     Defendant RANDY T. WRAY (hereinafter sometimes referred to as 'WRAY") is a resident of the state of Pennsylvania residing at 2737 Emig Mill Road, Dover, Pennsylvania 17315.

8.     Defendant RAYMOND ABBOUD (hereinafter sometimes referred to as "ABBOUD") is a resident of the state of Pennsylvania residing at 3775 Druck Valley Road, York, Pennsylvania 17406.

9.     Defendant ABRAHIM KHAN (hereinafter sometimes referred to as "KHAN") is a resident of the state of Pennsylvania residing at 3246 Staunton Avenue, Dover, Pennsylvania 17315.

10.     Defendant DAVID SANDBERG is a resident of the state of Pennsylvania residing at 106 Hillcourt Drive, Red Hill, Pennsylvania 18076.

11.     Defendant CHRISTOPHER SANDBERG is a resident of the state of Pennsylvania, residing at 2606 Anthony Road Drive, Pottstown, Pennsylvania

19164. Defendants DAVID SANDBERG and CHRISTOPHER SANDBERG are hereinafter sometimes collectively referred to as "SANDBERGS."

12.     This Court has jurisdiction over this matter to decide a federal question of law under 28 USCA Section 1331 and 15 USCA Sections 1 and 15 and 15 USCA Section 1125 (a).  This Court has supplemental jurisdiction to decide state law claims under 28 USCA Section 1367.

13.     Venue is proper in the Middle District of Pennsylvania as a location where Plaintiff RER does business and Defendants FENTIMAN, SCHLESINGER, WRAY, ABBOUD, KHAN, and SANDBERGS reside. It is also the location where Defendants ABBOUD and KHAN have filed suit against Plaintiffs.

14.     On or about June 6, 2006, FENTIMAN completed the RER Program. A copy of his Customer Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

15.     On or about April 26, 2007, Defendant SCHLESINGER completed the RER Program. A copy of her Customer Agreement (in partnership with her husband, Leor Schlesinger) is attached hereto as Exhibit "B" and incorporated herein by reference.

16.    On or about February 28, 2007, FENTIMAN was hired as an

independent contractor by PAH Investors, LLC, an Operator of the RER program

in the State of Pennsylvania. A copy of FENTIMAN's Independent Contractor

Agreement with PAH Investors, L.L.C. (hereinafter referred to as the

"Agreement") is attached hereto as Exhibit "C" and incorporated herein by

reference.

17.    FENTIMAN's duties as an independent contractor under the

Agreement were as follows:

> Contractor agrees to provide services to Company upon terms and
> conditions as may be determined from time to time by Contractor and
> Company, including but not limited to, marketing Real Estate Riches
> training program and system as directed by the Company, and
> providing teaching and instruction services to customers of the Real
> Estate Riches training program system. Contractor agrees to devote its
> exclusive best efforts to provide the duties and services to the
> Company and customers of Company during the term Contractor is
> associated with Company under this Agreement … and further agrees
> to abide by all rules and regulations of Company, including, but not
> limited to, compliance policies  and company rules, guidelines and
> regulations which may be promulgated from time to time by
> Company." (Agreement Paragraph 1)

Under the terms of the Agreement, "Company" included not only PAH

Investors, L.L.C., but also "Real Estate Riches, Inc., and all other companies

owned or controlled by or affiliated with Real Estate Riches, Inc wherever situate and however named." (Agreement Paragraph 13)

18.   As is the industry standard, RER has been engaged in developing "Continuity Programs" designed to teach existing RER Members additional real estate investment strategies and procedures not covered by the initial RER Program. RER has spent hundreds of hours at a value of tens of thousands of dollars to date in the development of Continuity Programs. As an independent contractor for PAH and RER, FENTIMAN knew of the ongoing development of the Continuity Programs and the nature of the expenses RER was incurring in connection therewith.

19.   At all times pertinent times hereto, FENTIMAN has also engaged in buying and selling real estate as a wholesaler of properties in Pennsylvania, individually and through Properties America Network, L.L.C. (hereinafter sometimes referred to as "PAN"), which he owns together with Defendant Schlesinger.   Wholesaling properties is one of the strategies taught to FENTIMAN and SCHLESINGER as part of the RER program they completed.

20.    While serving as a classroom instructor for the RER Program and while outside the instructional classroom, FENTIMAN also sought to market the properties owned by FENTIMAN and / or PAN to RER students. In order to facilitate such marketing of properties to RER students without the normal safeguards that such students would receive by having such prospective transactions reviewed by their RER mentors, FENTIMAN sought to induce such students to bypass the safeguards of their RER mentors by disparaging RER, by disparaging the RER mentors, by disparaging other wholesalers of properties and by advising RER students that he could teach them everything that RER and its mentors could teach them in the context of the transactions involving the properties that he and / or PAN would be selling to them.

21.    On or about January 29, 2008, FENTIMAN and SCHLESINGER began advertising that they would provide mentoring services to real estate investors. A copy of the E-mail from FENTIMAN and SCHLESINGER offering such mentoring services is attached hereto as Exhibit "D" and incorporated herein by reference.

22.     At all times relevant hereto, RER has maintained a website which includes both a public section open to Member and non members of RER as well as a restricted section that could only be accessed by RER Members who had completed the RER course and received a password to access the restricted section of the website. The restricted section of the website includes a Forum component which allows Members with access thereto to advertise properties to one another so as to facilitate the purchase and sale of such properties.  The use of the RER website is a privilege available to RER Members, rather than a right to which they are entitled, and the same may be withdrawn by RER at any time for violation of the rules of the RER website or otherwise.

23.     As part of its educational program, RER incorporates the recommendation of Napoleon Hill, from his book "Think and Grow Rich" to use independent Mastermind Groups to bring together investors with common interests to discuss matters of common concern involving real estate education, local market conditions and similar matters for their mutual benefit.  The spirit and intent of the Mastermind Groups is that they are intended to be operated for the mutual benefit of all present and are not to be utilized by anyone for their own agenda or to

promote their own interests separate and apart from the mutual benefit of the entire group.  Although RER does not sponsor, control or organize the Mastermind Group meetings, or the subjects discussed thereat, RER has traditionally allowed the dates, times and locations of such Mastermind Group meetings to be advertised on the restricted Forum component of the RER website accessible by RER Members in good standing.

24.    On or about June 28, 2008, in York, Pennsylvania, during a motor vehicle altercation, FENTIMAN drew his handgun and fired two shots into the thigh of Douglas Need, severing Need's femoral artery and causing Need to bleed to death.   Since that time, FENTIMAN has consistently promoted the knowledge of his having shot Need to death, to internet postings, newspaper articles and through his personal comments.  It is well known within the Harrisburg, York and Allentown communities that FENTIMAN carries a gun and that FENTIMAN shot Need to death, and as a result, FENTIMAN has created and perpetuated an aura of fear and intimidation among persons in these communities who come in contact with him.

25.    On or about November 6, 2008, in an effort to discredit RER and RER approved service providers and thereby enhance his own position with RER Customers and others, FENTIMAN, together with SCHLESINGER and PAN, began soliciting adverse comments about competing wholesalers and RER. The initial mechanism for soliciting such comments was a Properties American Network Survey of Experience (hereinafter the "Survey") sent by email to hundreds of RER members, most of whom FENTIMAN had never done any business with.  The Survey included an open ended invitation for the recipients of the Survey to furnish comments (intended by FENTIMAN and SCHLESINGER to be adverse comments) about their experience with other wholesalers of properties and with the RER Program, and as an RER Member.  A true and correct copy of this Survey is attached hereto as Exhibit "E" and incorporated herein by reference.

26.    Beginning in the later half of 2008 and into 2009, FENTIMAN sought to undermine the purpose and intent of Mastermind Group meetings and began appearing at meetings in numerous locations, not only in central Pennsylvania, but also Philadelphia, Pennsylvania and Baltimore, Maryland.  He began utilizing such meetings as a forum to disparage RER, its mentors, other wholesalers of properties

11

and RER service providers and as an opportunity to market his own properties and services and develop his own personal mailing list for the marketing of such properties.

27.     On or about November 20, 2008, RER withdrew FENTIMAN's and SCHLESINGER's privileges to use the restricted section of the RER website for reasons including, without limitation, the following:

a.     FENTIMAN and SCHLESINGER offering to provide mentoring services in competition with RER and using RER furnished information, contrary to the terms of their Customer Agreements with RER;

b.     FENTIMAN disparaging RER and RER Mentors and Service Providers and other wholesalers of properties in the course of RER training classes he was conducting and / or attending.

c.     FENTIMAN and SCHLESINGER sending out the Survey to RER Members without the advance knowledge or consent of RER, and thereafter failing to furnish a satisfactory explanation to RER as to why the Survey had been sent.

d.    FENTIMAN using the RER website contrary to the terms of use thereof including, without limitation, using the website to develop an email list of persons to whom they could market properties, disparage RER and disparage other wholesalers of properties and RER approved Service Providers and market a service that competes with RER.

28.    On or about January 20, 2009, FENTIMAN sent out a falsely identified and misleading TWENTY FOUR (24) page email to RER customers detailing his battle with RER to have his Forum access reinstated with the intent of seeking to rally support to pressure RER into reinstating FENTIMAN's access to the restricted portion of the RER website and to harm RUBIN and RER if such access were not reinstated. A true and correct copy of this email is attached hereto as Exhibit "F" and incorporated herein by reference.

29.    On or about January 22, 2009, FENTIMAN and SCHLESINGER sent out an email to RER customers to announce a meeting scheduled for January 29, 2009 to discuss FENTIMAN's battle with RER and the "hot topic, the misleadingly referenced Attorney General Complaint against RER". A true and

13

correct copy of this email is attached hereto as Exhibit "G" and incorporated herein by reference.

30.     On or about January 29, 2009, FENTIMAN conducted a meeting of approximately sixty (60) RER Members at his office located at 24 W. King Street, York, Pennsylvania.  At the meeting, FENTIMAN stated that his goal was to be made whole and to be reinstated as a Member with Real Estate Riches and to be provided the services which he claimed Real Estate Riches promised and which he was not provided.  Though he stated that his goal was not to bring Real Estate Riches down, he made it clear that if that did happen, he would still operate and provide services to his customers.  During the meeting, FENTIMAN removed a nine millimeter semiautomatic handgun from a holster he was wearing under his sweatshirt, held it up for all in the room to see, stated that it was loaded, and placed it on top of a display board for approximately fifty minutes in front of the room positioned in such a place where FENTIMAN was between the handgun and those persons in attendance at the meeting. During this meeting, FENTIMAN handed out copies of two complaints he said he had filed with the Pennsylvania Attorney General's Office, copies of which are attached as composite Exhibit "H" and

incorporated herein by reference. FENTIMAN also handed out a compilation of

purported excerpts and claimed he had received regarding RER in response to the

Survey (Exhibit "E" to Complaint) and the TWENTY FOUR (24) page email

(Exhibit "F" to Complaint) that FENTIMAN had orchestrated. A true and correct

copy of the "excerpts" distributed by FENTIMAN at the meeting of January 29 is

attached hereto as composite Exhibit "I" and incorporated herein by reference.

FENTIMAN also stated that there was a Federal Civil Rights lawsuit against Real

Estate Riches with regard to preventing an individual from taking the Real Estate

Riches course and becoming a Member based upon the person's color and ethnic

name.  FENTIMAN then stated that he had a "Call To Action" against Real Estate

Riches.  He provided everyone at the meeting a copy of a blank Pennsylvania

Office of the Attorney General's Consumer Complaint Form and asked that anyone

who had a complaint to complete it and give it to him and that he would hand carry

it to the Attorney General's Office.  At the conclusion of the meeting, FENTIMAN

asked if anyone had any complaint forms to turn in or to fax them to him by the

following day. Several individuals gave completed forms to FENTIMAN and

several indicated they would fax them to him.

31.    On or about February 2, 2009, FENTIMAN and Schlesinger sent out an email summarizing the January 29, 2009 meeting at FENTIMAN'S office to hundreds of RER members. A true and correct copy of this email summary is attached hereto as Exhibit "J" and incorporated herein by reference.

32.    Mastermind Group Coordinators in Emmaus, Pennsylvania, Philadelphia, Pennsylvania and Baltimore, Maryland have communicated to FENTIMAN and SCHLESINGER that FENTIMAN and SCHLESINGER would no longer be allowed into the Mastermind Meetings in those cities. Notwithstanding such prior communication, FENTIMAN and SCHLESINGER sought to attend the Mastermind Group Meeting in Emmaus, Pennsylvania on February 19, 2009, and when they were denied access thereto, remained on site outside the meeting location and continued their campaign of misrepresentation and defamation of RER to RER Members in attendance at such location.

33.    As FENTIMAN had explicitly given permission to the hundreds of recipients of the TWENTY FOUR (24) page email, "Exhibit F", to re-circulate it among other RER Members, it was actually FENTIMAN and SCHLESINGER's design and intent that any and all persons heed his "Call to Action" and thereby

disseminate false and disparaging misinformation about RER that FENTIMAN

thereafter provided,  whether orally or in writing including, without limitation,

Exhibits "H", "I", and "J", not only to other Real Estate Riches Members, but

beyond. (See, for example, Exhibit "H" at Page 7). As Harrisburg, Allentown,

York, and surrounding central Pennsylvania communities are small closely knit

communities, FENTIMAN knew, or should have known, that his ongoing

disparagement of RER through Exhibits "F", "H", "I" and, "J" and otherwise

would quickly spread throughout these communities and beyond and cause

foreseeable damage to RER and to Rubin.

## **COUNT I**

34.    This is an action by Plaintiffs against Defendants FENTIMAN,

SCHLESINGER, WRAY, ABBOUD, KHAN, and SANDBERGS brought under

Section I of the Sherman Act, 15 USCA Section 1 pursuant to the authority of 15

USCA Section 15.

35.    Plaintiff's repeat, reallege, reaver and incorporate herein by reference

all of paragraphs 1 through 33 as though fully rewritten herein.

36.    FENTIMAN and SCHLESINGER, individually and through PAN,

compete with RER in the offering of Real Estate Mentoring Services in the mid

Atlantic region of the United States including the states of Pennsylvania, New

Jersey, Delaware, and Maryland.  While RER offers Real Estate Mentoring

Services to its students as a component the RER Program, FENTIMAN and

SCHLESINGER provide such mentoring services under the guise of

comprehensive transactional assistance to those persons who purchase wholesale

deals from them.  RER students pay a separately delineated fee for classroom and

mentoring services, whereas FENTIMAN's and SCHLESINGER's customers are

never told the true cost of their mentoring as such mentoring is paid for out of the

average profit of close to TEN THOUSAND DOLLARS ($10,000.00) per property

that FENTIMAN and SCHLESINGER receive for wholesaling properties to their

customers.

37.    Although FENTIMAN and SCHLESINGER ceased stating that they

provide "mentoring" to their customers after RER initially took away their RER

Website privileges for violating their Customer Agreement with RER by offering

such mentoring services, FENTIMAN and SCHLESINGER continue to provide

such mentoring without referring to it as mentoring, but instead advising their

customers that they will "walk them through every aspect of their real property

transactions".

38.    In an effort initially intended to pressure RER into restoring his RER

website privileges, and later designed to harm RER and Rubin for refusing to do

so, and unlawfully compete with RER in violation of 15 USCA Section 1,

FENTIMAN, has orchestrated and carried out a series of interrelated conspiracies

directed against RER and Rubin.

39.    The actions of the defendants herein described (hereinafter referred to

as the "Group Boycott Scheme" were designed to induce an illegal restraint of

trade by causing RER Members to engage in a group boycott of RER services

including, without limitation, boycott of the Continuity Programs offering

advanced real estate training and boycott of referral of new students by existing

Members for the initial RER Program, so as to give FENTIMAN and

SCHLESINGER a competitive advantage in offering their services to these

existing RER Members and potential new RER students.

40.    FENTIMAN's conspiratorial conduct in conjunction with

SCHLESINGER in furtherance of the Group Boycott Scheme included, without

limitation, the following:

a.    Participating in the formulation, creation and circulation of the

Survey attached hereto as Exhibit "E" to hundreds of RER Members designed to

seek to foment hostility toward RER and discredit RER, and thereby induce the

group boycott of RER's services;

b.    Engaging in a campaign of e-mail disparagement of RER,

including, without limitation, circulation of Exhibit "F" to hundreds of RER

Members to seek to foment hostility toward RER, and seek to discredit RER, and

thereby induce the group boycott of RER's services.

c.    Inviting RER Members to attend and participate in the meeting

of January 29, 2009 at FENTIMAN's office   where it was intended by

FENTIMAN and SCHLESINGER that Exhibits "H" and "I" would be handed out

and the spurious allegations of discrimination published and such Exhibits were

handed out in such spurious allegations of the discrimination published to seek to

foment hostility toward RER, and seek to discredit RER, and thereby induce the group boycott of RER's services.

d.     Furnishing Exhibit "J" "summarizing" the January 29, 2009 meeting by email to hundreds of RER Members to seek to foment hostility toward RER, and seek to discredit RER, and thereby induce a group boycott of RER's services.

e.     Notwithstanding the fact that the Mastermind Group Coordinator for such meeting had explicitly told FENTIMAN and SCHLESINGER that they were not welcome at such meeting, appearing at the Mastermind Meeting of February 19, 2009 in Emmaus, Pennsylvania, and circulating false and defamatory written materials and making false and defamatory statements concerning RER to RER Members, to seek to foment hostility toward RER, and seek to discredit RER, and thereby induce a group boycott of RER's services.

f.     Circulating the December 13, 2008 email advocating the election of Dave Sandberg as Harrisburg Mastermind Coordinator, thereby supporting the conspiracy hereafter described in paragraph 43.

g.      Otherwise encouraging, assisting, and supporting one another in the conspiratorial campaign seeking to foment hostility toward RER and to discredit RER, and thereby induce a group boycott of RER's services.

41.      FENTIMAN's conspiratorial conduct in conjunction with ABBOUD and KHAN in furtherance of the Group Boycott Scheme included, without limitation, the following:

a.      On or before September 22, 2008, FENTIMAN conspired with Raymond ABBOUD and ABRAHIM KHAN to disrupt a Real Estate Riches workshop and to file spurious litigation against Real Estate Riches falsely alleging that Real Estate Riches refused to allow minority members in its Program so as to lay a foundation for FENTIMAN's future spurious allegations that RER engaged in discriminatory conduct toward ethnic minorities which FENTIMAN intended to use to seek to foment hostility toward RER and seek to discredit RER, and thereby induce the group boycott of RER's services.

b.      In furtherance of this conspiracy, on or about September 22, 2008, ABBOUD and KHAN attended a free Real Estate Riches Investment Workshop conducted at the Sheridan Four Points Hotel in York, Pennsylvania and

presented by Matt Bellis on behalf of RER.  ABBOUD AND KHAN, at the behest

and/or under the direction of FENTIMAN, attended this workshop under the

subterfuge of being guests, but were rude and intentionally disruptive throughout.

ABBOUD AND KHAN sat in the front of the workshop talking loudly to one

another throughout the presentation, reading and shuffling newspapers, tapping

pens, drinking alcoholic beverages and getting up throughout the presentation to go

back to the hotel bar and return with more alcoholic beverages.  It was apparent

that ABBOUD AND KHAN were not interested in the material being presented

and were doing their best to disrupt the workshop to the detriment of RER and the

other guests present.  As a result of their behavior, despite the fact that there were

ten guests in attendance at the workshop, for the first and only time in the history

of RER, not one student signed up for the RER program as a result of a workshop.

      c.    At the workshop, it was explained that the next step in the

process of becoming an RER customer was to conduct a face to face interview in

order to determine if all parties were equally comfortable with each other prior to

engaging in a relationship of mutual obligation, responsibility and cooperation of

effort.

d.      On or about October 17, 2008, as they had previously arranged
with FENTIMAN, ABBOUD and KHAN came to the RER office in Reading,
Pennsylvania to conduct a mutual interview with Scott McDonald and Chad
Cassner, representatives of RER.  During the interview, ABBOUD and KHAN
represented themselves as very experienced real estate professionals and investors.
CASSNER and MCDONALD explained what RER teaches, and ABBOUD and
KHAN claimed to already possess the same knowledge, so CASSNER and
MCDONALD asked what ABBOUD and KHAN hoped to derive from the
Program.  Neither ABBOUD nor KHAN could offer any explanation so
CASSNER and MCDONALD asked ABBOUD and KHAN about their rude and
disruptive behavior at the RER workshop.  When CASSNER and MCDONALD
asked ABBOUD and KHAN about bringing alcohol to the workshop, ABBOUD
and KHAN initially denied it, but then later admitted it, suggesting that all of
RER's customers drink.  When CASSNER and MCDONALD asked ABBOUD
and KHAN why they were disruptive at the workshop, ABBOUD and KHAN
became abusive toward CASSNER and MCDONALD.  When CASSNER and
MCDONALD stated they were becoming very uncomfortable with how ABBOUD

and KHAN were conducting the interview, ABBOUD and KHAN stormed out of the office.

        e.    On or about January 13, 2009, ABBOUD and KHAN filed suit in the U.S. District Court for the Middle District of Pennsylvania against Chad Cassner, Scott McDonald, Jeffrey Rubin and Real Estate Riches, Inc. for alleged violation of the Fair Housing Act and Title XIII of the Civil Rights Act of 1968 based largely upon their allegation that they "learned from Brian FENTIMAN, an employee of Real Estate Riches, that it has a policy of not admitting minorities to the organization."  This lawsuit, captioned <u>Raymond Abboud and Abrahim Khan v Chad Cassner, et. al</u>, Civil Action Number 1:09-CV-63, is a subterfuge and is nothing more than an effort by FENTIMAN, in conjunction with co-conspirators ABBOUD and KHAN, to foment hostility toward RER, and seek to discredit RER, and thereby induce the group boycott of RER's services to seek to gain an unfair competitive advantage in securing mentoring business in the Mid Atlantic States to the detriment of RER.

f.     Otherwise encouraging, assisting, and supporting one another in the conspiratorial campaign seeking to foment hostility toward RER and to discredit RER, and thereby induce a group boycott of RER's services.

42.     FENTIMAN's conspiratorial conduct with WRAY in furtherance of the Group Boycott Scheme included, without limitation, the following:

a.     On or before January 26, 2009, FENTIMAN met with Defendant WRAY to seek to induce WRAY to join the conspiracy to foment hostility toward RER seek to discredit RER, and thereby induce the group boycott of RER's services.

b.      At this time, FENTIMAN furnished WRAY with a copy of a Complaint or complaints that FENTIMAN claimed he had already filed with the Pennsylvania Attorney General's Office, alleging that Real Estate Riches engaged in deceptive radio advertising and habitually failed to provide the mentoring services that it agreed to provide as part of the Member's Agreement with RER. FENTIMAN coached WRAY on how to file a Complaint against RER and how to use the Attorney General's online complaint form to submit a claim against RER. As a result of such action, WRAY filed an online complaint with the Pennsylvania

Attorney General's Office against RER, a true and correct copy of which is

attached hereto as Exhibit "K" and incorporated herein by reference.  On page 2 of

this Complaint, WRAY states "Please reference this Complaint with the one

submitted by Brian Fentiman on 1/20/09."  In reality, FENTIMAN had not yet

filed a Complaint with the Pennsylvania Attorney General's Office.

     c.     On or about February 5, 2009, Defendant WRAY contacted

Brock Kerchner, an executive with WHP and WTKT Radio in Harrisburg,

Pennsylvania.  WHP and WTKT are members of Clear Channel Communications

Network and RER has long advertised its workshops and its program on WHP,

WTKT and other Clear Channel radio networks.  WRAY made his call in

conspiracy with FENTIMAN, and made the call in effort to seek to damage RER

by having RER's advertising removed from WHP, WTKT and other Clear Channel

network affiliates.  During the conversation, WRAY falsely informed Kerchner

that Craig Stevens, a radio personality who promotes RER in RER's radio

advertising "doesn't own half the houses he says he does and that RER was

advertising falsely".  WRAY also told Kerchner that the Pennsylvania attorney

General and the FCC had been contacted [by FENTIMAN] and were looking into

things and that he just wanted to let Kerchner know this "before the **** hit the

fan".  The call to Kerchner by WRAY in furtherance of the conspiracy was an

attempt to foment hostility toward RER and seek to discredit RER, and thereby

induce the group boycott of RER's services  by trying to convince WHP, WTKT,

and / or any other stations on the Clear Channel radio network to remove RER's

advertising from the airwaves.

      d.     Furnishing spurious complaints in response to Exhibit "F" with

the intent that they be republished to RER Members

      e.     Otherwise encouraging, assisting, and supporting one another in

the conspiratorial campaign seeking to foment hostility toward RER and to

discredit RER, and thereby induce a group boycott of RER's services.

     43.     FENTIMAN's conspiratorial conduct with SANDBERGS in

furtherance of the Group Boycott Scheme included, without limitation, the

following:

      a.     On and prior to January 15, 2009, Ellen Bierbower had served

as the Mastermind Coordinator for the Mastermind Group in Harrisburg,

Pennsylvania.  When it became apparent that Bierbower no longer wished to

coordinate the Harrisburg Mastermind Group, FENTIMAN, and SANDBERGS

conspired to take over the Harrisburg Mastermind Meeting and use it to and seek to

promote the Group Boycott Scheme to foment hostility toward RER and seek to

discredit RER, and thereby induce the group boycott of RER's services.

      b.     Prior to January 15, 2009, FENTIMAN and the SANDBERGS

agreed that the SANDBERGS would serve as the Harrisburg Mastermind

coordinators and in that capacity, furnish FENTIMAN with a forum and

cooperation in his scheme.

      c.     At a Harrisburg Mastermind Meeting in January 2009, as had

been prearranged between FENTIMAN and SANDBERGS, FENTIMAN sat next

to the SANDBERGS and proposed that David Sandberg and his brother,

Christopher Sandberg be the coordinators for the Harrisburg Mastermind Group.

In furtherance of the scheme, Defendant SCHLESINGER had sent out an email to

Harrisburg area RER Members on or about December 13, 2008 advocating the

election of DAVID SANDBERG as Harrisburg Mastermind Coordinator. (See

Exhibit "L" attached hereto and incorporated herein by reference) Intimidated by

FENTIMAN, his reputation for having shot and killed a man, and for carrying a

firearm, no one present suggested any alternative coordinator for the Harrisburg

Mastermind Group and the SANDBERGS became the Harrisburg Mastermind

coordinators.

        d.      SANDBERGS, in conspiracy with FENTIMAN have given

FENTIMAN an unrestricted forum at Harrisburg Mastermind Meetings to make

disparaging comments about RER in an effort to foment hostility toward RER,

seek to discredit RER and thereby induce the group boycott of RER's services.

        e.      When RER notified the SANDBERGS that RER was no longer

going to allow its website and Forum to be used to notify members of upcoming

Mastermind Group meetings, the SANDBERGS circulated this statement to their

own private email list of RER Members who had been attending their Mastermind

Meetings, twisted and unfairly editorialized the exchange of e-mail with RER on

the subject thereof and refused to allow RER to communicate directly with the list

of people to whom SANDBERG's had sent their comments regarding RER. RER

has subsequently determined that the temporary halt in allowing advertising of

Mastermind Group Meetings on its website had been lifted as to all Mastermind

Groups that conduct their meetings in the true spirit of a Mastermind Group, i.e.

for the mutual benefit of all persons present threat, but that Notice of Meetings would not be permitted on the RER website for those who continued to conduct meetings which were not in the true spirit of a Mastermind Meeting or who sought to attack or discredit Real Estate Riches thereat.

       f.     Inducing SANDBERG's to defame RER by publishing Exhibits "M" and "N" attached to the Complaint and incorporated therein by reference and circulating them to RER Members in order to foment hostility toward RER, seek to discredit RER and induce the group boycott of RER's services.

       g.     Otherwise encouraging, assisting, and supporting one another in the conspiratorial campaign seeking to foment hostility toward RER and to discredit RER, and thereby induce a group boycott of RER's services.

44.    The actions of FENTIMAN, SCHLESINGER, WRAY, ABBOUD, KHAN, and SANDBERGS have induced a group boycott of RER's services and RER has been damaged thereby.

WHEREFORE, Plaintiffs demand judgment as follows:

(a)     for injunctive relief compelling Defendants to cease their anti-competitive actions including the disparagement of RER and other actions designed to induce the group boycott of RER services;

(b)     Compensatory damages for the losses they have suffered and will continue to suffer as a result of the unlawful Group Boycott Scheme;

(c)     Statutory Damages against all Defendants for three times the amount of Plaintiffs' compensatory damages in accordance with 15 USC Section 15;

(d)     Court costs

(e)     Attorney's fees and

(f)     such other and further relief as this Court deems appropriate in the premises.

## **COUNT II**

45.     This is an action by Plaintiffs against Defendants FENTIMAN and SCHLESINGER under Section 43 (a) of the Lanham Act, 15 USCA Section 1125 (a)

46.     Plaintiff's repeat, reallege, reaver and incorporate herein by reference all of paragraphs 1 through 33 and 36 through 44 as though fully rewritten herein.

47.    Defendants FENTIMAN's and SCHLESSINGER's real estate and mentoring services compete with Plaintiff RER's Program and mentoring services in the consumer market in the mid-Atlantic states including, without limitation, Pennsylvania, New Jersey, Delaware and Maryland.  Defendants specifically advertise against Plaintiffs RER's services in writings that are transmitted by email and otherwise through interstate commerce and/or handed out in person to persons present at one or more meetings who received notice and/or invitation to such meetings by email and/or otherwise through interstate commerce.  Such advertisements include, without limitation, Exhibits "F", "H", "I", "J", "K", "M", "N" attached hereto and Defendants FENTIMAN's and SCHLESINGER's website, "PropertiesAmericaNetwork.com.  Information in such advertisements concerning Plaintiff's services are often inaccurate, false, and / or misleading. Beginning on or about January 20, 2009 and continuing since that time, Defendants FENTIMAN and SCHLESINGER have maligned Plaintiff RER's Services by circulating, in interstate commerce, false and misleading commercial advertisements and/or promotions effectively summarized as follows:

a.     RER's radio advertising is false and misleading.

b.      RER habitually does not deliver on its promise of providing the agreed mentoring services to its Members.

c.      RER discriminates against minorities and does not allow them as Members.

d.      RER is unjust and oppressive toward its Members.

e.      RER services are not worth the cost of the Program.

In addition thereto, Defendants FENTIMAN and SCHLESINGER'S false and misleading commercial advertising or promotion circulated in interstate commerce comparing what they offer to what RER offers is effectively summarized as follows:

f.      We provide all the mentoring benefits that RER provides and our mentoring won't cost you anything.

g.      The mentoring services we provide are better than those RER provides.

h.      RER Members routinely have many problems with their properties and RER doesn't care about their success or try to help them, while we will assure your success with every property.

48.     Defendants FENTIMAN's and SCHLESINGER's commercial advertising or promotion misrepresentations concerning Plaintiffs and in comparison of their services RER's are false and malicious and calculated to negatively impact upon Plaintiff RER and the sales of its services and thereby adversely affect Plaintiff RUBIN.  Advertising that FENTIMAN's and SCHLESINGER's mentoring services are superior to those of RER is unequivocally false because

a.      Unlike RER, which provides independent mentors with no interest in  transactions they are evaluating, FENTIMAN and SCHLESINGER are providing mentoring on their own transactions, thereby creating an inherent bias inexorably leading FENTIMAN and SCHLESINGER to approve their own deals and eliminating the very protection that is at the heart of the mentoring concept.

b.      FENTIMAN and SCHLESINGER only provide their mentoring services on their particular deal(s) as opposed to RER's students who have ongoing access to their RER mentors for many potential transactions during the 90 day mentoring period.

      c.     FENTIMAN and SCHLESINGER provide only a single "exit strategy" to their customers, namely to rehab a property and then rent it out, or sell it.  Conversely, RER students learn not less than 4 additional exit strategies namely

      (1)    "bird dogging" (locating properties for a fee),

      (2)    obtaining rights of assignment on properties they locate

      (3)    taking title and then wholesaling the property to a "rehabber"

      (4)    selling the property as a lease option.

49.    In addition to Defendants FENTIMAN's and SCHLESINGER's commercial advertising or promotion in Exhibits "F", "I", "J" and the Properties America Network website, advertising or promotion maligning RER's services was circulated by Defendants SANDBERGS as co-conspirators or agents of FENTIMAN and SCHLESINGER to hundreds of RER Members.  SANDBERGS compiled and circulated by e-mail the false and malicious advertising or promotion FENTIMAN and SCHLESINGER, copies of which are attached to the Complaint as Exhibits "M" and "N".

50.    Defendants FENTIMAN and SCHLESINGER knew that commercial advertising or promotion for them contained in Exhibits "M" and "N" contained

statements about Plaintiffs that were false and misleading as detailed in Paragraphs

105 – 112 hereof.  Defendants FENTIMAN and SCHLESINGER are directly

responsible for the acts of their agents and co-conspirators SANDBERGS in

spreading the false and malicious advertising or promotion. Furthermore, by failing

to act and to effectively stop the spread of the misrepresentations by

SANDBERGS, Defendants FENTIMAN and SCHLESINGER have encouraged,

acquiesced in and / or ratified SANDBERGS misrepresentations contained in

advertising or promotion concerning Plaintiff RER's services.

51.    Defendants FENTIMAN and SCHLESINGER have made, or allowed

to be made, the foregoing false, defamatory, and disparaging statements in

connection with the promotion and sale of such Defendants' services in order to

obtain economic gain and persuade consumers (including RER's Members) to

cease purchasing RER's services and instead purchase competing Defendants

services, all to the benefit of Defendants FENTIMAN and SCHLESINGER and to

the detriment of Plaintiffs.

52.    The false and malicious statements published and circulated by

Defendants FENTIMAN and SCHLESINGER regarding Plaintiffs and Plaintiff

RER's Services, deceived consumers and caused consumers to stop purchasing

RER's Services.

53.     Despite Defendants FENTIMAN and SCHLESINGER'S control over

SANDBERGS, and in direct conflict with the obligations of Defendant

FENTIMAN to Plaintiff RER, FENTIMAN and SCHLESINGER have acted with

reckless indifference and have failed to control SANDBERGS, who have

continued to spread defamatory statements about Plaintiffs to disparage Plaintiff

RER's services and to commit other wrongful conduct detrimental to Plaintiffs.

54.     The statements and representations made by Defendants FENTIMAN

and SCHLESINGER and those persons under their control, including

SANDBERGS, of and concerning Plaintiff, including, but not limited to,

advertising, publishing, disseminating and communicating false and misleading

statements and unfounded misrepresentations about the business, goodwill, and

reputation of Plaintiffs, including, those false statements herein above described in

Paragraph 47.

55.   The aforementioned false statements and representations of and concerning Plaintiffs were published, disseminated or otherwise communicated by Defendants FENTIMAN and SCHLESINGER or under their direction and control.

56.   The aforementioned false statements and representations made by or at the direction of Defendants FENTIMAN and SCHLESINGER concerning Plaintiffs were published, disseminated or otherwise communicated across state borders and in interstate commerce.

57   The aforementioned false statements and representations made by Defendants FENTIMAN and SCHLESINGER or under their direction and control, of and concerning Plaintiffs were statements and representations of a commercial nature, and constituted commercial speech since they were published, disseminated, or otherwise communicated with the intent of increasing Defendants' sales and / or decreasing Plaintiff RER's sales.

58.   The aforementioned statements and acts actually deceived and had a tendency to deceive a substantial segment of the intended audience of potential and actual customers and consumers.  These false, misleading, and disparaging

statements and the deceptions practiced influenced the purchasing decisions of

actual and potential customers and consumers of Plaintiff RER's services.

59.    Plaintiffs have been injured as a direct and proximate result of the

conduct of Defendants FENTIMAN and SCHLESINGER.  Plaintiff RER suffered

a diversion of its sales from itself to Defendants as well as injury to the goodwill

and reputation that Plaintiffs and Plaintiff RER's services enjoy with the buying

public.

60.    The publication of these false and deceptive statements and the other

acts and conduct of Defendants as alleged above, constitute false and deceptive

trade practices in violation of Section 43 (a) of the Lanham Act, 15 USCA Section

1125 (a), which caused harm and damage to Plaintiff RER's business and services

and Plaintiff RUBIN's beneficial interest therein.

61.    As a result of Defendant FENTIMAN and SCHLESINGER'S

conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

62.    Defendants FENTIMAN and SCHLESINGER deliberately, willfully,

and in bad faith committed the aforementioned violations of the Lanham Act.  The

aforesaid conduct of Defendants FENTIMAN and SCHLESINGER constitute an

exceptional case under 15 USCA Section 1117 (a).  Plaintiff is therefore entitled to

recover enhanced damages and reasonable attorneys fees incurred in this action.


WHEREFORE, Plaintiffs pray for relief as follows:

(a)      Judgment against Defendants FENTIMAN and SCHLESINGER for

an amount to be determined at trial, but estimated at not less than FIFTEEN

MILLION DOLLARS ($15,000,000.00)

(b)      For an Order permanently enjoining and restraining Defendants

FENTIMAN and SCHLESINGER and their partners, agents, co-conspirators,

corporate entities, and affiliates, individually and jointly from:

(1)      Publishing, circulating, or causing publication or circulation of

the statements or any similar false statements to those set forth in Paragraph 47

herein.

(2)      Committing any of the aforesaid unfair methods of competition,

unfair or deceptive acts or practices.

(c)      For an Order requiring defendants FENTIMAN and SCHLESINGER

to affirmatively communicate by all reasonable  means to all persons to whom they

have previously circulated the following statements and/or inference that such

statement and /or inferences are false and must not, under any circumstances, for

any purposes be published or circulated:

      1.     RER's radio advertising is false and misleading.

      2.     RER habitually does not deliver on its promise of providing the

agreed mentoring services to its Members.

      3.     RER discriminates against minorities and does not allow them

as members.

      4.     RER is unjust and oppressive toward its Members.

      5.     RER services are not worth the cost of the RER Program.

(d)    For judgment against the Defendants FENTIMAN and

SCHLESINGER for attorney's fees because this case constitutes an exceptional

case and entitles Plaintiff to recovery of attorneys fees and costs against such

Defendants.

(e)    Under the Lanham Act, for an accounting of all profits of Defendants

FENTIMAN AND SCHLESINGER including those achieved through PAN for

mentoring services, whether or not disguised as wholesale profits, attributable to

their wrongful conduct, unjust enrichment and / or unfair trade practices alleged herein, and judgment awarding Plaintiffs all moneys wrongfully obtained by such defendants' unfair trade practices, false and deceptive trade practices, unfair competition, and violation of the Lanham Act.

(f)     Judgment against Defendants FENTIMAN and SCHLESINGER for costs.

(g)     for such other and further relief as the Court deems appropriate in the premises.

## COUNT III

63.     This is an action by Plaintiffs against Defendants FENTIMAN, SCHLESINGER, WRAY, ABBOUD, KHAN and SANDBERGS for civil conspiracy to disparage and damage RER, drive RER out of business and /or undermine the value of RUBINS interest in the RER Assets.

64.     Plaintiff's repeat, reallege, reaver and incorporate herein by reference all of paragraphs 1 through 33, 36 through 44 and 47 through 62 as though fully rewritten herein.

65.     In an effort initially intended to pressure RER into restoring his RER website privileges, and later designed to harm RER and Rubin for refusing to do so, FENTIMAN has orchestrated and carried out a series of interrelated conspiracies directed against RER and Rubin.

The actions of the defendants herein described (hereinafter referred to as the "Civil Conspiracy Scheme") were designed to foment hostility toward RER, disparage and damage RER, drive RER out of business and /or undermine the value of RUBIN's RER Assets.

66.     FENTIMAN's conspiratorial conduct in conjunction with SCHLESINGER in furtherance of the Civil Conspiracy Scheme included, without limitation, the following:

a.      Participating in the formulation, creation and circulation of the Survey attached hereto as Exhibit "E" to hundreds of RER Members designed to seek to lay the foundation for fomenting hostility toward RER, disparage and damage RER, drive RER out of business and / or the undermine the value of RUBIN's RER Assets.

b.      Engaging in a campaign of e-mail disparagement of RER, including, without limitation, circulation of Exhibits "F" to hundreds of RER Members to seek to disparage and damage RER, drive RER out of business and / or undermine the value of RUBIN's RER Assets.

c.      Inviting RER Members to attend and participate in the meeting of January 29, 2009 at FENTIMAN's office   where it was intended by FENTIMAN and SCHLESINGER that Exhibits "H" and "I" would be handed out and allegations regarding alleged RER discrimination would be discussed by FENTIMAN and such Exhibits were in fact, handed out and the alleged discrimination by RER was discussed by FENTIMAN to seek to foment hostility toward RER, seek to disparage and damage RER, drive RER out of business and / or undermine the value of RUBIN's RER Assets.

d.      Furnishing Exhibit "J" "summarizing" the January 29, 2009 meeting by email to hundreds of RER Members to seek foment hostility toward RER, to disparage and damage RER , drive RER out of business and / or undermine the value of RUBIN's RER Assets.

e.     Otherwise encouraging, assisting, and supporting each other in the conspiratorial campaign seeking to foment hostility toward RER, disparage and damage RER, drive RER out of business RER and / or undermine the value of RUBIN's RER Assets.

67.     FENTIMAN's conspiratorial conduct in conjunction with ABBOUD and KHAN in furtherance of the Civil Conspiracy Scheme included, without limitation, the following:

a.     On or before September 22, 2008, FENTIMAN conspired with Raymond ABBOUD and ABRAHIM KHAN to disrupt a Real Estate Riches workshop and to file spurious litigation against RER falsely alleging that RER refuses to allow minority members in its program so as to lay a foundation for FENTIMAN's spurious allegations that RER engaged in discriminatory conduct toward ethnic minorities which FENTIMAN intended to use to foment hostility toward RER, seek to disparage and damage RER, drive RER out of business and / or undermine the value of RUBIN's RER Assets.

b.     In furtherance of this conspiracy, on or about September 22, 2008, ABBOUD and KHAN attended a free Real Estate Riches Investment

Workshop conducted at the Sheridan Four Points Hotel in York, Pennsylvania and presented by Matt Bellis on behalf of RER.  ABBOUD AND KHAN, at the behest and/or under the direction of FENTIMAN, attended this workshop under the subterfuge of being guests, but were rude and intentionally disruptive throughout. ABBOUD AND KHAN sat in the front of the workshop talking loudly to one another throughout the presentation, reading and shuffling newspapers, tapping pens, drinking alcoholic beverages and getting up throughout the presentation to go back to the hotel bar and return with more alcoholic beverages.  It was apparent that ABBOUD AND KHAN were not interested in the material being presented and were doing their best to disrupt the workshop to the detriment of RER and the other guests present.  As a result of their behavior, despite the fact that there were ten guests in attendance at the workshop, for the first and only time in the history of RER, not one student signed up for the RER Program as a result of a workshop.

c.    At the workshop, it was explained that the next step in the process of becoming an RER customer was to conduct a face to face interview in order to determine if all parties were equally comfortable with each other prior to

engaging in a relationship of mutual obligation, responsibility and cooperation of effort.

      d.    On or about October 17, 2008, ABBOUD and KHAN came to the RER office in Reading, Pennsylvania to conduct a mutual interview with Scott McDonald and Chad Cassner, representatives of RER.  During the interview, ABBOUD and KHAN represented themselves as very experienced real estate professionals and investors.  CASSNER and MCDONALD explained what RER teaches, and ABBOUD and KHAN claimed to already possess the same knowledge, so CASSNER and MCDONALD asked what ABBOUD and KHAN hoped to derive from the program.  Neither ABBOUD nor KHAN could offer any explanation so CASSNER and MCDONALD asked ABBOUD and KHAN about their rude and disruptive behavior at the RER workshop.  When CASSNER and MCDONALD asked ABBOUD and KHAN about bringing alcohol to the workshop, ABBOUD and KHAN initially denied it, but then later admitted it, suggesting that all of RER's customers drink.  When CASSNER and MCDONALD asked ABBOUD and KHAN why they were disruptive at the workshop, ABBOUD and KHAN became abusive toward CASSNER and

MCDONALD.  When CASSNER and MCDONALD stated they were becoming very uncomfortable with how ABBOUD and KHAN were conducting the interview, ABBOUD and KHAN stormed out of the office.

      e.     On or about January 13, 2009, ABBOUD and KHAN filed suit in the U.S. District Court for the Middle District of Pennsylvania against Chad Cassner, Scott McDonald, Jeffrey Rubin and Real Estate Riches, Inc. for alleged violation of the Fair Housing Act and Title XIII of the Civil Rights Act of 1968 based largely upon their allegation that they "learned from Brian Fentiman, an employee of Real Estate Riches, that it has a policy of not admitting minorities to the organization."  This lawsuit captioned <u>Raymond Abboud and Abrahim Khan v Chad Cassner, et. al</u>, Civil Action Number 1:09-CV-63 is a subterfuge and is nothing more than an effort by FENTIMAN, in conjunction with co-conspirators ABBOUD and KHAN, to disparage and discredit RER and to seek to gain an unfair competitive advantage in securing mentoring business in the Mid Atlantic States to the detriment of RER, to foment hostility toward RER, to disparage and damage RER, drive RER out of business and / or undermine the value of RUBIN's RER Assets.

f.      Otherwise encouraging, assisting, and supporting each other in the conspiratorial campaign seeking to foment hostility toward RER, disparage and damage RER, drive RER out of business RER and / or undermine the value of RUBIN's RER Assets.

68.     FENTIMAN's conspiratorial conduct with WRAY in furtherance of the Civil Conspiracy Scheme included, without limitation, the following:

a.      On or before January 26, 2009, FENTIMAN met with Defendant WRAY to seek to induce WRAY to join the conspiracy to foment hostility toward RER, seek to disparage and damage RER, drive RER out of business and / or undermine the value of RUBIN's RER Assets.

b.       At this time, FENTIMAN furnished WRAY with a copy of a Complaint or complaints that FENTIMAN claimed he had already filed with the Pennsylvania Attorney General's Office, alleging that Real Estate Riches engaged in deceptive radio advertising and habitually failed to provide the mentoring services that it agreed to provide as part of the Member's Agreement with RER. FENTIMAN coached WRAY on how to file a Complaint against RER and how to use the Attorney General's online complaint form to submit a claim against RER.

As a result of such action, WRAY filed an online complaint with the Pennsylvania Attorney General's Office against Real Estate Riches, a true and correct copy of which is attached hereto as Exhibit "K" and incorporated herein by reference.  On page 2 of this Complaint, WRAY states "Please reference this Complaint with the one submitted by Brian Fentiman on 1/20/09."  In reality, FENTIMAN had not yet filed a Complaint with the Pennsylvania Attorney General's Office.

        c.      On or about February 5, 2009, Defendant WRAY contacted Brock Kerchner, an executive with WHP and WTKT Radio in Harrisburg, Pennsylvania.  WHP and WTKT are members of Clear Channel Communications network and RER has long advertised its workshops and its program on WHP, WTKT and other Clear Channel radio networks.  WRAY made his call in conspiracy with FENTIMAN, in an effort to seek to damage RER by having RER's advertising removed from WHP, WTKT and other Clear Channel stations.  During the conversation, WRAY falsely informed Kerchner that Craig Stevens, a radio personality who promotes RER in RER's radio advertising "doesn't own half the houses he says he does and that RER was advertising falsely".  WRAY also told Kerchner that the Pennsylvania "Attorney General and the FCC had been

contacted [by FENTIMAN] and were looking into things and that he just wanted to let Kerchner know this before the **** hit the fan".  The call to Kerchner by WRAY in furtherance of the Civil Conspiracy Scheme was an attempt to foment hostility toward RER, seek to disparage and damage RER, drive RER out of business and / or undermine the value of RUBIN's RER Assets.

        d.      Otherwise encouraging, assisting, and supporting each other in the conspiratorial campaign seeking to foment hostility toward RER, disparage and damage RER, drive RER out of business RER and / or undermine the value of RUBIN's RER Assets.

     69.    FENTIMAN's conspiratorial conduct with SANDBERGS in furtherance of the Civil Conspiracy Scheme included, without limitation, the following:

        a.      On and prior to January 15, 2009, Ellen Bierbower had served as the Mastermind Coordinator for the Mastermind Group in Harrisburg, Pennsylvania.  When it became apparent that Bierbower no longer wished to coordinate the Harrisburg Mastermind Group, FENTIMAN and SANDBERGS conspired to take over the Harrisburg Mastermind Meeting and use it to and seek to

promote civil conspiracy scheme to foment hostility toward RER, seek to disparage and damage RER, drive RER out of business and / or destroy RER and / or undermine the value of RUBIN's RER Assets.

      b.     Prior to January 15, 2009, FENTIMAN and the SANDBERGS agreed that the SANDBERGS would serve as the Harrisburg Mastermind coordinators and in that capacity, furnish FENTIMAN with a forum and cooperation in the civil conspiracy.

      c.     At a Harrisburg Mastermind Meeting in January 2009, FENTIMAN proposed David Sandberg and his brother, Christopher Sandberg be the coordinators for the Harrisburg Mastermind Group and sat beside them as he made this proposal.  In furtherance of the scheme, Defendant SCHLESINGER had sent out an email to Harrisburg area RER Members on or about December 13, 2008 advocating the election of DAVID SANDBERG as Harrisburg Mastermind Coordinator. (See Exhibit "L" attached hereto and incorporated herein by reference) Intimidated by FENTIMAN, his reputation for having shot and killed a man, and for carrying a firearm, no one present suggested any alternative

coordinator for the Harrisburg Mastermind Group and SANDBERGS became the Harrisburg Mastermind coordinators.

d.     David Sandberg and Chris Sandberg, in conspiracy with FENTIMAN have sought to and have given FENTIMAN an unrestricted forum to make disparaging comments about Real Estate Riches in an effort foment hostility toward RER, disparage and damage RER, drive RER out of business and / or undermine the value of RUBIN's RER Assets.

e.     When RER notified SANDBERGS that RER was no longer going to allow its website and Forum to be used to notify members of upcoming Mastermind Group meetings, the Sandberg's circulated this statement to their own private email list of RER Members who had been attending their Mastermind Meetings, twisted and unfairly editorialized the exchange of e-mail with RER on the subject thereof and refused to allow Real Estate Riches to communicate directly with the list of people to whom Sandberg's had sent their comments regarding Real Estate Riches. Real Estate Riches has subsequently determined that the temporary halt in allowing advertising of Mastermind Group Meetings on its website had been lifted as to all Mastermind Groups that conduct their meetings of

54

the true spirit of a Mastermind Group, i.e. for the mutual benefit of all persons

present thereat, but that Notice of Meetings would not be permitted on the RER

website for those who continued to conduct meetings which were not in the true

spirit of a Mastermind Meeting or who sought to attack or discredit Real Estate

Riches thereat.

    f.  Inducing SANDBERGS to defame RER by publishing Exhibits

"M" and "N" attached to the Complaint and circulating them to RER Members in

order to foment hostility toward RER, seek to disparage and damage RER, drive

RER out of business and / or undermine the value of RUBIN's RER Assets.

    g.  Otherwise encouraging, assisting, and supporting each other in

the conspiratorial campaign seeking to foment hostility toward RER, disparage and

damage RER, drive RER out of business RER and / or undermine the value of

RUBIN's RER Assets.

   70.  The actions of FENTIMAN, SCHLESINGER, WRAY, ABBOUD,

KHAN, and SANDBERGS have to date caused a diminution in value of RUBIN's

RER Assets in an amount to be determined at trial but estimated at not less than

FIFTEEN MILLION DOLLARS ($15,000,000.00) representing THIRTY

PERCENT (30%) of the value thereof as existed prior to their wrongful conduct, and RER and RUBIN have been damaged thereby.

WHEREFORE, Plaintiffs demand judgment as follows:

(a)     Compensatory damages in an amount to be determined at trial for the losses they have suffered to date in the amount of not less than FIFTEEN MILLION DOLLARS ($15,000,000.00) and such additional damages as they may continue to suffer as a result of the Civil Conspiracy Scheme;

(b)     Court costs

(c)     Attorney's fees and

(d)     Such other and further relief as this Court deems appropriate in the premises.

## COUNT IV

71.   This is a Complaint by Plaintiffs against Defendants FENTIMAN, SCHLESINGER and SANDBERGS for business disparagement also known as trade libel under Pennsylvania Law.

72.     Plaintiffs repeat, reallege, reaver and incorporate herein by reference all of paragraphs 1 through 33, 36 through 44, 47 through 62 and 65 through 70 as though fully rewritten herein.

73.     Defendants FENTIMAN and SCHLESSINGER published disparaging statements concerning the business of Plaintiff RER and by implication concerning its Founder and Principal Jeffrey L. Rubin including without limitation:

        a.      RER's radio advertising is false and misleading.

        b.      RER habitually does not deliver on its promise of providing the agreed mentoring services to its Members.

        c.      RER discriminates against minorities and does not allow them as Members.

        d.      RER Members routinely have many problems with their properties and RER doesn't care about their success or try to help them.

74.     In addition, Defendants FENTIMAN and SCHLESINGER facilitated, cooperated in, condoned and/or did not require the retraction of the statement of Defendant SANDBERGS, who operate under their direction and control, that the (a) "RER leadership . . . try to silence anyone who desires MORE out of the

network ," (Exhibit "M") and (b) that RUBIN had taken an "unfounded aggressive policy stance" (Exhibits "M" and "N") and (c) "there is only one important difference between Napoleon Hill and RER.  Napoleon Hill's book did not didn't cost $6,500.00, $7,500.00, or $9,500.00 and didn't come with empty promises or false advertisements." (Exhibit "N")

75.    The statements of SCHLESINGER and FENTIMAN and the statements of SANDBERG for which they and SANDBERGS are responsible, were false and Defendants FENTIMAN, SCHLESINGER, and SANDBERGS intended that such publications cause pecuniary loss or reasonably should have recognized that such publications would result in pecuniary loss to Plaintiffs.

76.    The publications caused actual pecuniary loss to Plaintiffs.

77.    FENTIMAN, SCHLESSINGER, and SANDBERGS knew the publications referenced in paragraphs 73 and 74 were false or acted in reckless disregard of their truth or falsity.


WHEREFORE, Plaintiffs demand judgment against Defendants FENTIMAN, SCHLESINGER, and SANDBERGS for compensatory damages

estimated at not less than FIFTEEN MILLION DOLLARS ($15,000,000.00),

Court costs, attorney's fees and such other and further relief as this Court deems

appropriate in the premises.

## COUNT V

78.   This is an action by RER against Defendant FENTIMAN for breach

for that Agreement attached to the Complaint as Exhibit "C" and incorporated

herein by reference.

79.   Plaintiffs repeat, reallege, reaver, and incorporate herein by reference

all of paragraphs 1 through 33, 36 though 44, 47 through 62, 65 though 70, and 73

though 77 as though fully rewritten herein.

80.   The Agreement imposed upon FENTIMAN's certain specific duties to

RER including, without limitation, the following:

    a.   "To maintain the absolute confidentiality of all [confidential information] during and after the term of the Agreement" and to "not use any such information in any other business or in any manner not specifically authorized or approved in writing by RER. (Exhibit "C" at Paragraph 7a)

    b.   "to not use any Confidential Information as basis upon which to develop or have a third party develop any competing or similar products or services" (Exhibit "C" Paragraph 7b)

       c.      During the term of the Agreement and for an additional period of one year to "not either directly or indirectly for himself or through, on behalf, or in conjunction with any person, persons, partnership, limited liability company or corporation

       (1)     Divert or attempt to divert any business or customer of the Business or Company to any competitor, by direct or indirect inducement or otherwise, or do or perform directly or indirectly any other act injurious or prejudicial to the good will associated with the Business and Company.

       (2)     Employ or seek to employ any person who is it at the time employed by Company, Company's affiliates or by any other Contractor of Company, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment.

       (3)     Own, maintain, engage in, consult with or have any interest in any business specializing in whole or in part, in marketing a real estate mentoring system, instructing a real estate mentoring system and related real estate investment matters. (Agreement at paragraph 10. b. [1] – [3]).

   81. In addition, under the Agreement, FENTIMAN agreed that, but for

contingencies not pertinent hereto, he shall not

       for a period of one (1) year after the expiration or termination of the Agreement, regardless of the cause of termination, either directly or indirectly, for himself or through, on behalf of or in conjunction with any person, persons, partnership, Limited Liability Company, or Corporation, own, maintain, engage in, consult with, or have any interest in any business marketing and real estate mentoring system instructing a real estate mentoring system and related real estate

investment matters within the state of Pennsylvania (Agreement at Paragraph 10c).

...directly or indirectly for himself or through on behalf of or in conjunction with any person, persons, partnership, small limited liability company, or corporation outside the Business during its association, provide or solicit to provide any services to the customers of the Company including but not limited to: wholesaling real estate property, real estate brokerage services, mortgage financing, investments, real estate and related partnering or joint venturing, mentoring or instruction of any kind, without the written consent of Company.

(Agreement at paragraph 10h)

82.    On or about October 1, 2007 RER established an oral contract with Major Frost, a construction contractor in Harrisburg, Pennsylvania.  Under the terms of such Agreement, Frost became an approved service provider for RER and became available to provide construction and rehabilitation services for RER Members. RER contracting with Major Frost as an approved service provider for RER provided value to RER as it enabled RER Members to secure qualified construction services from Major Frost in and around the Harrisburg area.

On or about January 1, 2009 FENTIMAN, in conjunction with SCHLESINGER, caused Major Frost to cease performing as a service provider for RER and induced Major Frost to become an "exclusive" contractor for

FENTIMAN and SCHLESINGER's clients contrary to the terms of Major Frost's employment as a service provider with RER.

83.   Through his conduct, FENTIMAN has breached each and every one of the foregoing duties, agreements, and covenants of the Agreement detailed in paragraphs 80 and 81 of this Complaint and Plaintiffs have been damaged thereby as a result of FENTIMAN's conduct. Moreover, Plaintiffs are suffering irreparable injuries  as a result of such breaches of the Agreement for which money damages alone cannot make them whole.

84.   The Agreement (Exhibit "C") was never terminated by either party and therefore automatically renewed for a second year through and including February 28, 2009 pursuant to the terms of paragraph 6 thereof.

85.   FENTIMAN and RER engaged in an exchange of emails for more than THIRTY (30) days seeking unsuccessfully to resolve their differences. The extensive but unsuccessful attempt to resolve such differences excuses the provisions of paragraph 20 of the Agreement as any further efforts at dispute resolution would have been vain and unsuccessful.

86.    RER has complied with all conditions precedent to bringing this action.

WHEREFORE, Plaintiffs demand judgment for as follows:

(a)    an order enjoining FENTIMAN "directly or indirectly, for himself or through, on behalf of, or in conjunction with any person, persons, partnership, Limited Liability Company, or corporation, owned, maintain, engage in, consult with or have any interest in any business marketing a real estate mentoring system, instructing real estate mentoring system and related real estate investment matters within the state of Pennsylvania, or wholesaling any properties to RER Students and Mentors through a date no earlier than March 28, 2011, representing the original termination date of the Agreement together with the one year prescription contained in  the Agreement plus that additional period of time during which FENTIMAN has been in breach of these covenants during the term of the Agreement.

(b)     an Order enjoining FENTIMAN from ever using any Confidential Information (as defined by the Agreement) in any other business or in any other manner not specifically authorized or approved in writing by RER.

(c)     an accounting of all profits earned, directly or indirectly, in real estate mentoring by FENTIMAN including, without limitation, these mentoring fees collected under the guise of wholesale profits during the term of the Agreement and payment of the same to Plaintiff RER.

(d)     the release of Major Frost from any "exclusive" obligation to provide contracting services to FENTIMAN's clients

(e)     compensatory damages

(f)     Court Costs, attorneys' fees and such other and further relief as the Court deems appropriate in the premises.

## COUNT VI

87.     This is an action by RER against Defendants FENTIMAN and SCHLESINGER for breach of their Customer Agreements attached hereto as Exhibit "A" and "B" and incorporated herein by reference.

88.   Plaintiffs repeat, reallege, reaver, and incorporate herein by reference all of paragraphs 1 through 33, 36 through 44, 47 through 70, 73 through 77 and 80 through 86 as though fully rewritten herein.

89.   Under the terms of their Customer Agreements, a duty was imposed upon FENTIMAN and SCHLESINGER to "not duplicate any information provided by RER for the purpose of competing with RER. "FENTIMAN and SCHLESINGER have breached this duty by (a) duplicating the RER information regarding mentoring services and using it to compete with RER and by (b) duplicating the RER information regarding Major Frost as an approved service provider for construction services in the Harrisburg, Pennsylvania area and utilizing such information to engage Major Frost as an "exclusive contractor" in the Harrisburg area, to compete with RER.

90.   RER has complied with all conditions precedent to bringing this action.

91. RER has been damaged by the above-referenced breaches of duty by FENTIMAN and SCHLESINGER.

WHEREFORE, RER demands judgment against FENTIMAN and
SCHLESINGER for

(a) compensatory damages

(b) Court costs

(c) Attorney's fees

(d) such other and further relief   as this Court deems appropriate in the premises.

## COUNT VII

92.     This is an action for defamation by Plaintiffs RER and RUBIN against
Defendants FENTIMAN and SCHLESINGER.

93.     Plaintiffs repeat, reallege, reaver, and incorporate herein by reference
all of paragraphs 1 through 33, 36 through 44, 47 through 70, 73 through 77, 80
through 86 and 89 through 91 and as though fully rewritten herein.

94.     On or about January 20, 2009, FENTIMAN and SCHLESINGER
prepared and published the defamatory communication attached hereto as Exhibit
"F" and incorporated herein by reference by emailing it to hundreds of RER
Members from FENTIMAN's email.

95.    On or before January 29, 2009, FENTIMAN and SCHLESINGER prepared the two undated letters of complaint to the Pennsylvania Attorney General attached hereto as composite exhibit "H" and incorporated herein by reference.

96.    On or before January 29, 2009, FENTIMAN and SCHLESINGER either (1) wrote, or (2) compiled and excerpted, after securing the comments contained therein through fabrications, misrepresentations and/or half-truths communicated to the third party writers of these comments, if any, the contents of exhibit "I" attached hereto incorporated herein by reference.

97.    Exhibits "H" and "I" were published by FENTIMAN and SCHLESINGER by handing them out to a group of approximately sixty RER students at a meeting on January 29, 2009, at FENTIMAN's office in York, Pennsylvania. FENTIMAN also defamed Plaintiffs at the January 29, 2009 meeting as his office by stating to approximately SIXTY (60) RER Members that "there was a Federal Civil Rights lawsuit against Real Estate Riches with regard to preventing an individual from taking the Real Estate Riches course and becoming a Member based upon the person's color and ethnic name."  Those in attendance at

such meeting had been invited to attend by FENTIMAN's and SCHLESINGER's

email, exhibit "G."

98.    On or about February 2, 2009,  FENTIMAN and SCHLESINGER

prepared and published the defamatory communication attached hereto as Exhibit

"J" and incorporated herein by reference by emailing it to hundreds of RER

Members from FENTIMAN's email.

99.    Exhibits "F", "H", and "J" and the oral statements by FENTIMAN

described in paragraph 97 were published by FENTIMAN and SCHLESINGER

with knowledge of their falsity or with reckless disregard for their truth or falsity.

Exhibit "I" was published and/or republished by FENTIMAN and

SCHLESINGER with knowledge of its falsity or with reckless disregard for its

truth or falsity.

100.   Exhibits "F", "H", "I" and "J"  and the oral statements by

FENTIMAN described in paragraph 97 contained numerous false and defamatory

statements regarding Plaintiffs which were intended to expose Plaintiffs to hatred,

ridicule or contempt and/or intended to injure Plaintiffs in their business,

reputation, or occupation.  Such publications were known to be false when made

and were made by FENTIMAN and SCHLESINGER as well as with an intent to generate and foment ill will and hostility toward Plaintiffs and an intent to harm Plaintiffs and Plaintiffs have been damaged as a result as such defamatory statements.

101. The Exhibits "F" "H", "I", and "J" and the oral defamatory communications described in paragraph 97 refer to the Plaintiffs RER and RUBIN.

102. The contents of Exhibit "F" "H", "I", and "J" contain defamatory statements and/or implications including, without limitation, the following:

a. The title of the Exhibit "F" email, "Attorney General complaint against RER" is false and misleading as it is intended to convey the impression that the Attorney General has filed a complaint against RER which it has not done. Rather, it was BRIAN FENTIMAN who had prepared, but by that time not even filed, a complaint against RER with the Pennsylvania Attorney General. (Page 1)

b. Exhibit "F" falsely stated that RUBIN and RER banned FENTIMAN from use of the restricted portion of the RER website because FENTIMAN "opened an office in York) or because FENTIMAN "did not give [RUBIN FENTIMAN'S] prospective buyers list quickly enough. These statements are false and are designed to make RUBIN appear capricious and malicious toward FENTIMAN. (Page 2)

c.      Exhibit "F" states "I have seen other wholesalers and Real Estate Riches who move from one [bad] deal to the next with few consequences for their actions. (Page      3-4)

d.      Exhibit "F" states that actions of RER are "COERCION", that FENTIMAN had been "denied access since January 29, 2008 for unsubstantiated charges" (Page      9)

e.      Exhibit "F" states that FENTIMAN was "unjustly banned from the RER forum" and "unfairly denied access to benefits." (Page 10)

f.      Exhibit "F" states that "there were a lot of RER members in the mid-Atlantic region who felt they were getting ripped off by the RER operation up here." (Page 11)

g.      Exhibit "F" states that RER operators "CHAD CASSNER and SCOTT MCDONALD 'had [FENTIMAN] under a microscope' … looking for any excuse to ban [FENTIMAN]" (Page 1 6)

h.      Exhibit "F" states that FENTIMAN was "arbitrarily [denied] membership" in RER on the basis of "hearsay and/or word of mouth" (Page      19)

i.      Exhibit "F" states that "the minute the leaders of RER think they have the power to unjustly take from ANY OF ITS MEMBERS the rights and benefits of a lifetime membership and access to a membership that was duly paid for, NONE of us then actually controls our businesses or is safe from this threat" (Page      22)

j.      Exhibit "F" states that FENTIMAN had "taken [his] concerns about having been denied [his] membership benefits and other issues about Real Estate Riches to the PA Attorney General and the Federal Communications Commission (FCC) who deals with

complaints about deceptive or illegal radio advertising." This is false as FENTIMAN had not yet filed any complaint with the Pennsylvania Attorney General and wrongly infers that RER's radio advertising was deceptive or illegal. (Page 23)

k.      Exhibit "H" states that information provided by RER is "false and misleading" (Page 1)

l.      Exhibit "H" states that RER bans members "without justification" (Page 1)

m.      Exhibit "H" states that monthly meeting coordinators are "in collusion with the owners or in fear of reprisals [from RER]." (Page 1)

n.      Exhibit "H" states "distressed members [of RER] have lost tens of thousands of dollars through their association with those who advertise regularly for the [RER] program and are protected because of it". (Page ____2 )

o.      Exhibit "H" states that "there were a lot of RER members in the mid-Atlantic region who felt they were getting ripped off, not only by the RER operation up here, but also by the wholesalers who were supported by RER and still allowed in the classes." (Page   4)

p. Exhibit "H" states that the information taught in RER courses is outdated and untrue. (Page 11)

q.      Exhibit "I" states "I think the best thing that could happen would be to put RER out of business (or at least take SCOTT and CHAD off the air)". (Page 1)

r.     Exhibit "I" states that [FENTIMAN and SCHLESINGER] were the victims of RER "torture" and "injustice". (Page 3)

s.     Exhibit "I" states that "RER [is] a sham ... "stealing money from people by making promises they never intend to keep… [RER is] "no better than Bernie Madoff and [its principals]  should be put in jail and have their assets seized and given back to hard working members." (Page 4)

t.     Exhibit "I" states "it sounds to me like [JEFF RUBIN] is not really concerned about new members becoming successful and he has lost touch with the original purpose of RER". (Page 10        )

u. Exhibit "I" states that a student was "swindeled" (sic) by RER (Page 14)

v.     Exhibit "J" states that at the meeting of January 29, 2009 "**Many** RER members decided then and there that their concerns were so great that they would make a complaint to the Consumer Protection Division of the PA Attorney General". (Page 5, Emphasis Supplied)

w.     FENTIMAN's oral statements described in paragraph 97 were false and defamatory as they sought to create the impression that a meritorious Federal civil rights lawsuit had been filed against RER based upon some conduct of RER, when FENTIMAN knew that there was no legitimate basis for such lawsuit and that such lawsuit never would have been filed but for the conspiracy of ABBOUD, KHAN and FENTIMAN as described herein.

103.   The recipients of FENTIMAN's and SCHLESINGER's publications understood the communications' defamatory character.

104.    Notwithstanding the possible appearance of some of the defamatory publications and /or republications described herein as "opinion," such publications and / or republications are actionable for defamation as they are either mixed statements of fact and opinion or statements of opinion based upon undisclosed defamatory facts and in either event, remain fully actionable.

105.    Plaintiffs RUBIN and RER have been damaged as a result of FENTIMAN's and SCHLESINGER's defamatory publications contained in Exhibits "F", "H", and "J", FENTIMAN's and SCHLESINGER's defamatory publications and/or republications in Exhibit "I" and FENTIMAN's oral defamatory publication described in Paragraph 97.

WHEREFORE, Plaintiffs demand judgment against FENTIMAN and SCHLESINGER for:

(a) compensatory damages

(b) Court costs

(c) Attorney's fees

(d) such other and further relief   as this Court deems appropriate in the premises

## COUNT VIII

106.   This is the complaint for defamation by Plaintiffs RER and RUBIN against Defendants SANDBERGS.

107.   Plaintiffs repeat, reallege, reaver, and incorporate herein by reference all of paragraphs 1 through 33, 36 through 44, 47 through 70, 73 through 77, 80 through 86, 89 through 90 and 92 through 102  as though fully rewritten herein.

108.   On or about February 13, 2009, SANDBERGS published the defamatory communication attached hereto as Exhibit "M" and incorporated herein by reference by emailing it to hundreds of RER Members.

109.   On or about February 27, 2009, SANDBERGS published the defamatory communication attached hereto as Exhibit "N" and incorporated herein by reference by emailing it to hundreds of RER Members.

110.   Exhibits "M" and "N" contain numerous false and defamatory statements regarding Plaintiffs which were intended to expose Plaintiffs to hatred, ridicule or contempt and/or intended to injure Plaintiffs in their business,

reputation, or occupation.  Such publications were known to be false when made and were made by SANDBERGS with an intent to generate and foment ill will and hostility toward Plaintiffs and an intent to harm Plaintiffs and Plaintiffs have been damaged as a result as such defamatory statements.

111.   Exhibits "M" and "N"  were published by SANDBERGS with knowledge of their falsity or with reckless disregard for their truth or falsity.

112.   The defamatory communications in Exhibits "M" and "N" defamatory communication refer to the Plaintiffs RER and RUBIN.

113.   The contents of Exhibits "M" and "N" contain defamatory statements and/or implications including, without limitation, the following:

    a.    Exhibit "M" states that RUBIN has made an "unfounded aggressive policy stance"

    b.    Exhibit "M" states that RER fee is "Ninety five hundred dollars for a 3 day course, provider list (some say outdated) and a free username/password to access the forum and other class materials", conspicuously omitting the ninety days of post class mentoring that is at the heart of the RER Program;

    c.    Exhibit "M" states that RUBIN stated that Mastermind Group coordinators had "the power of a dictatorship type role;."

    d.    Exhibit "N" states that "RER leadership . . . try to silence anyone who desires MORE out of the network;"

e.     Exhibit "N" states that RUBIN had taken an "unfounded aggressive policy stance;

f.     The attachment to exhibit "N" states "there is only one important difference between Napoleon Hill and RER.  Napoleon Hill's book did not didn't cost $6,500.00, $7,500.00, or $9,500.00 and didn't come with empty promises or false advertisements.", not only disparaging RER with the reference to its allegedly empty promises and false advertisements, but also suggesting that the RER course has no more value than a single book, and is not worth the price.

114.   The recipients of Exhibits "M" and "N" understood the communications' defamatory character.

115.   Notwithstanding the possible appearance of some of the defamatory publications described in Paragraph 113 as "opinion," such publications and / or republications are actionable for defamation as they are either mixed statements of fact and opinion or statements of opinion based upon undisclosed defamatory facts and in either event, remain fully actionable.

116.   Plaintiffs RUBIN and RER have been damaged as a result of SANDBERGS defamatory publications contained in Exhibits "M" and "N".

WHEREFORE, Plaintiffs demand judgment against SANDBERGS for:

(a) compensatory damages

76

(b) Court costs

(c) Attorney's fees; and

(d) such other and further relief  as this Court deems appropriate in the premises

## COUNT IX

117.   This is an action by Plaintiff RER and its principal Plaintiff RUBIN against defendants ABBOUD, KHAN and FENTIMAN for tortious interference with prospective contractual relations.

118.   Plaintiffs repeat, reallege, reaver, and incorporate herein by reference all of paragraphs 1 through 33, 36 through 44, 47 through 70, 73 through 77, 80 through 86, 89 through 90, 92 through 104  and 107 through 116 as though fully rewritten herein.

119.   RER directly and RUBIN, beneficially, had a prospective contractual relationship with those eight prospective RER students (other than ABBOUD and KHAN) assembled at the RER workshop at the Sheridan Four Points Hotel in York, Pennsylvania on September 22, 2008.

120.   FENTIMAN, ABBOUD and KHAN had a purpose and intent to prevent the contractual relationship from actually occurring between such eight prospective students and RER.

121.   ABBOUD, KHAN and FENTIMAN had no privilege or justification to prevent such contractual relationship from occurring.

122.   RER directly, and RUBIN, beneficially, have been damaged as a result of the conduct of ABBOUD and KHAN, as orchestrated by FENTIMAN, as described herein.

WHEREFORE, Plaintiffs demand judgment against ABBOUD, KHAN and FENTIMAN for:

(a) compensatory damages estimated in the amount of SEVENTY SIX THOUSAND DOLLARS ($76,000.00)

(b) Court costs

(c) Attorney's fees; and

(d) such other and further relief  as this Court deems appropriate in the premises

## COUNT X

123.   This is an action by Plaintiff RER and its principal, Plaintiff RUBIN, against Defendants FENTIMAN, SCHLESINGER, and SANDBERGS for tortious interference with prospective contractual relations with existing RER Members and prospective RER students.

124.   Plaintiffs repeat, reallege, reaver, and incorporate herein by reference all of paragraphs 1 through 33, 36 through 44, 47 through 70, 73 through 77, 80 through 86, 89 through 90, 92 through 104 , 107 through 116 and 119 through 122 as though fully rewritten herein.

125.   RER directly and RUBIN, beneficially, had prospective contractual relationships with existing RER Members for the purchase of Continuity Programs as well as with prospective RER students who would ordinarily be referred to RER by existing Members.

126.   FENTIMAN, SCHLESINGER and SANDBERGS had a purpose or intent to prevent the contractual relationships described in paragraph 125 from actually occurring.

127.   FENTIMAN, SCHLESINGER and SANDBERGS had no privilege or justification to prevent the contractual relationships described in paragraph 125 from occurring.

128.   RER directly, and RUBIN, beneficially, have been damaged as a result of the conduct of FENTIMAN, SCHLESINGER and SANDBERGS as described herein.

WHEREFORE, Plaintiffs demand judgment against FENTIMAN, SCHLESINGER and SANDBERGS for:

(a) compensatory damages

(b) Court costs

(c) Attorney's fees; and

(d) such other and further relief  as this Court deems appropriate in the premises.

## <u>COUNT XI</u>

129.   This is an action by Plaintiff RER and its principal, Plaintiff RUBIN,

against Defendants FENTIMAN and SCHLESINGER for tortious interference

with contractual relations with Major Frost.

130.   Plaintiffs repeat, reallege, reaver, and incorporate herein by reference

all of paragraphs 1 through 33, 36 through 44, and 47 through 70, 73 through 77,

80 through 86, 89 through 90, 92 through 104,  107 through 116, 119 through 122

and 125 through 128 as though fully rewritten herein.

131.   On or about October 1, 2007, RER established an oral contract with

Major Frost, a construction contractor in Harrisburg, Pennsylvania.  Under the

terms of such Agreement, Frost was engaged as an approved service provider for

RER and became available to provide construction and rehabilitation services for

RER Members. The engagement of Major Frost as an approved service provider

for RER provided value to RER as it enabled RER Members to secure qualified

construction services from Major Frost in and around the Harrisburg area.

132.   On or about January 1, 2009 FENTIMAN, in conjunction with

SCHLESINGER, caused Major Frost to cease performing as a service provider for

RER and induced Major Frost to become an "exclusive" contractor for

FENTIMAN and SCHLESINGER's clients contrary to the terms of Major Frost's employment as a service provider with RER.

133.   FENTIMAN and SCHLESINGER's interference with the contractual relationship with RER and Major Frost was intentional and improper.

134.   RER has suffered a pecuniary loss as a result of Major Frost's failure to perform and act as a Service Provider for RER Members.


WHEREFORE Plaintiffs demand judgment against FENTIMAN and SCHLESINGER for:

(a) compensatory damages

(b) Court costs

(c) Attorney's fees; and

(d) such other and further relief  as this Court deems appropriate in the premises.

## COUNT  XII

135.   This is a cause of action by Plaintiff RER and its principal, Plaintiff RUBIN against defendants SCHLESINGER and FENTIMAN for tortious interference with prospective contractual relations with Major Frost.

136.   Plaintiffs repeat, reallege, reaver, and incorporate herein by reference all of paragraphs 1 through 33, 36 through 44, and 47 through 70, 73 through 77, 80 through 86, 89 through 90, 92 through 104 , 107 through 116, 119 through 122, 125 through 128  and 131 through 134 as though fully rewritten herein.

137.   RER directly and RUBIN, beneficially, had a prospective contractual relationship with Major Frost which would have amended the existing oral relationship with Major Frost and resulted in Major Frost signing a Service Provider Agreement with RER in form comparable to  the written Service Provider Agreements between RER and its other service providers. In furtherance thereof, on or about December 1, 2008, RER forwarded to Major Frost its standard written Service Provider Agreement then being implemented for all RER service providers. Major Frost's execution of this written Service Provider Agreement would have been of benefit to RER, its Members, and Rubin, indirectly as it would have continued to make Major Frost available to perform construction contracting

services for RER Members in the Harrisburg area pursuant to the terms of the proposed written Service Provider Agreement.

138.   FENTIMAN and SCHLESINGER had a purpose and intent to prevent the contractual relationship described in paragraph 137 from actually occurring between Major Frost and RER.

139.   FENTIMAN and SCHLESINGER had no privilege or justification to prevent such contractual relationship from occurring.

140.   On or about January 1, 2009 FENTIMAN, in conjunction with SCHLESINGER, caused Major Frost to refuse to sign the Service Provider Agreement with RER and induced Major Frost to become an "exclusive" contractor for FENTIMAN and SCHLESINGER's clients.

141.   RER directly, and RUBIN, beneficially, have been damaged as a result of the conduct of FENTIMAN and SCHLESINGER, as described in Count XII hereof.


WHEREFORE, Plaintiffs demand judgment against FENTIMAN and SCHLESINGER for:

(a) compensatory damages

(b) Court costs

(c) Attorney's fees; and

(d) such other and further relief  as this Court deems appropriate in the premises

## **COUNT XIII**

142.   This is a cause of action by Plaintiff RER and its principal, Plaintiff RUBIN against defendants SCHLESINGER and FENTIMAN for breach of their obligations of good faith and fair dealing.

143.   Plaintiffs repeat, reallege, reaver, and incorporate herein by reference all of paragraphs 1 through 33, 36 through 44, and 47 through 70, 73 through 77, 80 through 86, 89 through 90, 92 through 104 , 107 through 116, 119 through 122, 125 through 128,  131 through 134, and 137 through 141 as though fully rewritten herein.

144.   An obligation of good faith and fair dealing is implied by the law and therefore inherent in every contract or dealing.

145.   FENTIMAN and SCHLESINGER have breached the obligations of good faith and fair dealing owed to RER and to RUBIN, as owner and holder to all beneficial interests in RER, as well as third party beneficiary of all contracts between RER, FENTIMAN and SCHLESINGER including, without limitation those obligations set forth in Exhibits A, B, and C hereto and their course of dealings with Plaintiffs described throughout this Complaint.

146.   RER and RUBIN have been damaged as a result of the breaches by FENTIMAN and SCHLESINGER     of their obligations of good faith and fair dealing implied by the law and inherent in their contracts contained in Exhibits A, B, and C and in their course of dealings described throughout this Complaint.

WHEREFORE Plaintiffs demand judgment against FENTIMAN and SCHLESINGER for:

(a) compensatory damages

(b) Court costs

(c) Attorney's fees; and

(d) such other and further relief  as this Court deems appropriate in the premises.

## JURY DEMAND

Plaintiffs Real Estate Riches, Inc. and Jeffrey L. Rubin hereby demand trial

by jury of all issues properly so triable herein.

CUNNINGHAM & CHERNICOFF, P.C.


By: /s/ Bruce J. Warshawsky
              Bruce J. Warshawsky, Esquire
              PA Supreme Court ID# 58799
              CUNNINGHAM & CHERNICOFF, P.C.
              2320 North Second. Street
              Harrisburg, PA 17110
              Telephone:  (717) 238-6570
              *Attorneys for Plaintiffs*

Dated:  March 11, 2009
F:\Home\BJW\DOCS\Real Estate Riches\Exhibits.031109 Filing\Complaint.Final.wpd